## C. E. McNAUGHT v. CITY OF ST. JAMES AND OTHERS.[1]

December 4, 1936.

No. 31,165.

*E. M. Perrier* and *Wilson & Wilson,* for appellant (relator below).
*Albert Running* and *Farmer & Tighe,* for respondents.

JULIUS J. OLSON, JUSTICE.

Relator appeals from an order overruling his demurrer to defendants' answer, the court having certified the question presented to be important and doubtful.

Since March 26, 1918, St. James has been operating under a home rule charter as a city of the fourth class. In its proprietary capacity it owns and operates an electrical distributing system equipped with all appliances and apparatus necessary and convenient for

[1]Reported in 269 N. W. 897.

furnishing electric current for lighting, power, and other services to its inhabitants and other near-by localities.

On March 26, 1936, the council adopted a resolution calling for bids for electric energy. (It is proper to remark here that the city does not own or operate any electric generating system but must rely upon power furnished and provided beyond its limits.) Thereafter such proceedings were had that on May 21 a contract was entered into between the council, acting in behalf of the city, and the Northern States Power Company, whereby the company was to furnish and provide at wholesale prices all needed electric current to be delivered to the city at a station provided for that purpose and located adjacent to its corporate border. The contract runs over a period of ten years. Under the contract so made certain minimum and maximum amounts of electric energy must be provided. The minimum so to be used by the city in any given year must be at least of the value of $15,000. The maximum is dependent upon the needs and requirements of the city. Suitable provision is made respecting maximum and minimum charges. Likewise, provision is made for adding to or deducting from the monthly bills to be submitted to and paid by the city in the event there is any change in the cost of fuel to the power company in producing the electric energy so to be furnished.

The present difficulty arises by virtue of certain provisions contained in the home rule charter. For relator it is claimed that c. 4, § 65, governs. That section reads:

"ORDINANCES GRANTING FRANCHISES.

"Except as otherwise provided in the constitution of the state, *or as otherwise specified in this charter,* an ordinance or resolution, for the lease or sale of any public utility, or for the purchase of any property of the value of five thousand dollars or upwards, must be submitted to the electors of the city before the same shall be valid; and in no case shall any franchise be granted except by a vote of the people.

"The ballots used at such election shall contain the words, 'For the ordinance' (stating the nature of the proposed ordinance), and 'against the ordinance' (stating the same).

"Returns of such election shall be made to the clerk, as provided for other elections, and the council must meet and canvass the returns within three days.

"If a majority of the votes cast upon such submission shall be in favor thereof, the council shall, within thirty days from the time of such election, proclaim such fact, and upon such proclamation, such ordinances shall be legal and binding. No such franchise, or lease or sale of any public utility, or any such purchase of property, shall be of any force or effect, except it be made in the manner above provided." (Italics supplied.)

For defendants it is claimed that this section is not operative but that rather and only c. 10 (§§ 113 to 125, inclusive), furnishes the authority for the contract made. The controlling provisions are found in §§ 113 and 114, which read as follows:

"CONTRACTS

"DEFINITIONS.

"Sec. 113. *All contracts for commodities or service* to be furnished or performed for the city or any department thereof, involving an expenditure of more than five hundred dollars *shall be made as in this chapter provided, and not otherwise.*

"*The words 'commodities' and 'service' as used in this chapter, shall be construed to include* all work, labor, materials, supplies or other property and *all lighting and other service,* and all local or public improvements.

"The word 'contract' as used in this chapter, shall be construed to include every agreement, in writing or otherwise, executed or executory, by which any commodities, work or service are to be furnished to or done for the city, and every transaction whereby an expenditure is made or incurred on the part of the city or any department or officer thereof.

"All action in this chapter required or authorized to be taken by the council shall be by resolution or ordinance.

"ESTIMATE, AMOUNT OF CONTRACT.

"Sec. 114. The council, in the first instance shall, on its own motion, or may, on the recommendation or report of any department

or officer of the city determine, in a general way the commodities, work or services to be done or furnished, and shall fix the estimated cost thereof, and in order to determine such estimated costs may require estimates from any officer or employe of the city.

"In case such estimated cost, as determined by the council, shall not exceed the sum of five hundred dollars, the council may direct that the commodities, work or service be procured by or through the proper department or officer of the city without public bids.

*"In all cases where such estimated cost shall exceed the sum of five hundred dollars, said commodities, or service shall only be furnished or done upon public bids or procured in open market."* (Italics supplied.)

The court was of the view that the position taken by defendants was the correct one, hence overruled relator's general demurrer. We are thus confronted with a single question, aptly put by relator in his brief in this form: Is the contract "one which is required by the language of the city charter to be submitted to a vote of the electors" before it can become operative?

The contract involved (including the business of procuring and distributing electric current) is obviously a proprietary function. As such, the city in performing such business does not exercise its legislative functions, "but only its business or proprietary powers, to which the rules and principles of law applicable to contracts and transactions between individuals apply." Reed v. City of Anoka, 85 Minn. 294, 298, 88 N. W. 981, 982.

Nowhere in relator's brief is any suggestion made that the contract was not a provident and beneficial one for the city to make. Nor is the contract attacked as having for its duration an unreasonable length of time. The whole attack is based upon lack of power, not improper use thereof provided the power in fact exists. Clearly, as a business proposition, it was for the council to determine what should be done respecting the acquisition of electric current. In that capacity it is functioning the same as any private individual or corporation might do if engaged in similar business. It procures electric power for the purpose of distribution and resale to its inhabitants and users. In so doing it charges for the service

rendered, including as well for the current itself. As far as appears here, the city has made an extremely satisfactory business deal.

If instead of purchasing its power from another the city were engaged in the manufacture of its own current in conjunction with the distribution thereof, can it reasonably be said that the council lacked authority to enter into a contract for a year's coal or oil supply with which to produce the required energy? Yet, if relator's position is correct, this could not be done if the cost of a year's supply exceeded $5,000. Looking at this matter from a business-man's standpoint, as we must because the city is engaged in a business, can we say as a matter of law that the members of the charter commission intended so to fence in the council's authority as to require a submission to the electors from year to year of the amount of coal that should be purchased in order to operate its generating plant? The members of the commission were undoubt-edly practical and forward-looking business and professional men. As such, they knew that the annual expense of procuring electric current would greatly exceed the $5,000 limitation mentioned in § 65, and by virtue of which relator now claims this contract must be submitted to a vote. Such supposition is repulsive to sound business sense and a direct reflection upon the capacity of the com-mission to frame a workable charter under which this important part of the city administration might properly function.

It should be noted too that the portion of the charter upon which relator relies comes under the heading of "Ordinances Granting Franchises." That no franchise is here involved he freely concedes. That was one ground for the present proceeding, but was aban-doned, and in his brief he specifically so states. On the other hand, the proceeding had and adopted by the city council is under the charter relating to contracts. We think it is clear that the quoted sections (113 and 114) confer upon the council the required power here exercised.

We think the trial court correctly decided the issue. In a memorandum which we have found most helpful the court said:

"One can understand that, where specific property is involved which can only be acquired by direct purchase and not pursuant

to public bids, a submission of such a contract to a vote of the electors is a desirable safeguard for the municipality, but it is difficult to believe that the charter commission intended, after the city had acquired a light and power distribution system, to submit to the voters any contracts let upon bids for commodities or service in connection with such system without which service the entire system would become inoperative."

And further:

"The contract here in question was one for the purchase of commodities or service rather than for the purchase of property as contemplated by the provisions of section 65. The contract here in question for the furnishing of electrical energy to the city does not create an indebtedness under the provisions of this charter or any state law fixing a limit of indebtedness for the city. [1 Mason Minn. St. 1927, § 1765.] The construction contended for by the relator makes the two sections conflict with each other, while the construction indicated above gives effect to all the provisions and would also protect the rights of the parties."

The order is affirmed.